**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Juanita Washington, | No. CV-22-00649-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of her application for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 12), the Commissioner's answering brief (Doc. 13), and Plaintiff's reply (Doc. 14), as well as the Administrative Record (Doc. 11, "AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.     Procedural History

On November 20, 2019 Plaintiff filed an application for disability and disability insurance benefits, alleging disability beginning on August 2, 2019. (AR at 15.) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels of administrative review and Plaintiff requested a hearing before an ALJ. (*Id.*) On April 23, 2021, following a telephonic hearing, the ALJ issued an unfavorable decision. (*Id.* at 15-26.) The Appeals Council later denied review. (*Id.* at 1-4.)

II.   The Sequential Evaluation Process And Judicial Review

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is still capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If not, the ALJ proceeds to the fifth and final step, where she determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

1   III.   The ALJ's Decision

2          The ALJ found that Plaintiff had not engaged in substantial, gainful work activity

3   since the alleged onset date and that Plaintiff had the following severe impairments:

4   "diabetes, morbid obesity, knee degenerative joint disease, and degenerative disc disease."

5   (AR at 17-18.)[1]   Next, the ALJ concluded that Plaintiff's impairments did not meet or

6   medically equal a listing.  (*Id.* at 18-19.)   Next, the ALJ calculated Plaintiff's RFC as

7   follows:

> [T]he claimant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally
> operate foot controls bilaterally; never climb ladders, ropes, or scaffolds;
> never crawl; can occasionally climb ramps or stairs; can occasionally stoop,
> crouch, kneel, and balance; can have occasional exposure to non-weather
> related extreme cold, non-weather related extreme heat, non-weather related
> wetness, and non-weather related humidity; can have no exposure to
> dangerous machinery; and can have no exposure to unprotected heights.

13   (*Id.* at 19.)

14          As part of this RFC determination, the ALJ evaluated Plaintiff's symptom

15   testimony, concluding that Plaintiff's "medically determinable impairments could

16   reasonably be expected to cause the alleged symptoms" but that Plaintiff's "statements

17   concerning the intensity, persistence and limiting effects of these symptoms are not entirely

18   consistent with the medical evidence and other evidence in the record for the reasons

19   explained in this decision."  (*Id.* at 20-21.)   The ALJ also evaluated opinion evidence from

20   various medical sources, concluding as follows: (1) Dr. K. Scavetta, M.D., state agency

21   medical consultant ("generally persuasive"); (2) Dr. L. Schattzin, M.D., state agency

22   medical consultant ("generally persuasive"); (3) Dr. N. Lazorwitz, Psy.D. state agency

23   psychological consultant ("persuasive"); (4) Dr. E. Salk, Ph.D., state agency psychological

---

[1]       The ALJ also noted that Plaintiff presented evidence of sleep apnea, hypertension, gastroesophageal reflux disease, palpations, history of broken arm, and diabetic retinopathy but found that "the record does not indicate that these impairments cause more than minimal limitations on the claimant's ability to perform basic work activities, and they are thus nonsevere.  Such a determination is immaterial in this case, however, as the undersigned has taken into account the claimant's complete physical functioning in the residual functional capacity analysis, below."  (AR at 18.)   Further, although Plaintiff "reported anxiety and anxiety attacks," the ALJ determined it was "not a medically determinable impairment due to a lack of objective evidence."  (*Id.*)

consultant ("persuasive"); (5) Erica Neal, PA-C, consultative examiner ("partially persuasive"), (6) Christine Joy, PA ("unpersuasive"); (7) Rachel Giroux, D.O., treating provider ("unpersuasive"); and (8) Phillip Prusinski, FNP-C, treating provider ("unpersuasive").  (*Id.* at 22-24.)

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff could perform her past relevant work as a telephone solicitor, teacher aide II, social services aide, and employment training specialist.  (*Id.* at 24-25.)  Thus, the ALJ concluded that Plaintiff is not disabled.  (*Id.* at 25-26.)

IV.   Discussion

Plaintiff presents three issues on appeal: (1) whether the ALJ failed to properly evaluate the medical opinions of Dr. Giroux; (2) whether the ALJ failed to properly evaluate the medical opinions of FNP-C Prusinski; and (3) whether the ALJ failed to properly evaluate Plaintiff's symptom testimony.  (Doc. 12 at 1, 7.)  As a remedy, Plaintiff requests "this case be remanded for further proceedings, including a *de novo* hearing and new decision."  (*Id.* at 25.)

A.   **Dr. Giroux**

1.   Standard Of Review

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence.  *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because the new regulations apply to applications filed on or after March 27, 2017, they are applicable here.

The new regulations, which eliminate the previous hierarchy of medical opinions, provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources . . . .  The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a).[2]   Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1).   Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2).

Recently, the Ninth Circuit confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022).   Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies.   Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.*   With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence.   The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up).   Although an "ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records . . . the ALJ no longer needs to make specific findings regarding these relationship factors . . . ." *Id.*

…

---

[2]   Other factors that may be considered by the ALJ in addition to supportability and consistency include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and the specialization of the provider.   20 C.F.R. § 416.920c(c).

2.   Dr. Giroux's Opinions

On December 10, 2019, Dr. Giroux examined Plaintiff.  (*Id.* at 572-73.)  During the appointment, Dr. Giroux filled out a form entitled "Physical Assessment."  (*Id.* at 572-73.)  In filling out the form (which was provided in check-box format), Dr. Giroux diagnosed Plaintiff with "low back pain, chronic pain, and chronic [bilateral] knee pain."  (*Id.* at 572.)  Dr. Giroux then opined that Plaintiff would have various limitations as a result of these conditions, including that Plaintiff would need "to recline or lie down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon," could only walk "5-10 feet" without "rest or significant pain," could only sit 1 hour per day, could only stand/walk 0 hours per day, and would need "10-15 minute" breaks "every 30-60 minutes."  (*Id.*)  Dr. Giroux further opined that Plaintiff could "never" lift any weight and wrote "not able to assess" in relation to questions regarding Plaintiff's ability to use her hands, fingers, or arms.  (*Id.*)  Finally, Dr. Giroux opined that Plaintiff would be absent from work "more than four times a month."  (*Id.* at 573.)

3.   The ALJ's Evaluation Of Dr. Giroux's Opinions

The ALJ found Dr. Giroux's opinions unpersuasive.  (*Id.* at 23.)  The ALJ's full rationale was as follows:

> The undersigned considered the opinion of treatment provider Rachel Giroux, DO, who opined, for example, that the claimant can sit for one hour and stand or walk for 0 hours in an 8-hour workday, has to take unscheduled breaks every 30-60 minutes for 10-15 minutes, can never lift even less than 10 pounds, and is likely to be absent from work as a result of her impairments or treatment more than four times per month.  This opinion is unpersuasive.  While Dr. Giroux is a treatment provider, she provided minimal analysis in support of these opinions, which she made on a check-box form.  Additionally, these limitations are not supported by her own examination findings of, for example, tenderness.  Furthermore, the extreme intensity of these limitations is unsupported by and inconsistent with the longitudinal record, as described in the analysis of the Disability Determination Services consultant findings, above.

(*Id.*, record citations omitted.)

…

…

- 6 -

1

4.    The Parties' Arguments

2      Plaintiff argues that "the ALJ failed to properly explain how she considered both

3   the supportability and consistency factors in rejecting Dr. Giroux De Armendariz's

4   opinion, resulting in error."  (Doc. 12 at 10.)  Regarding supportability, Plaintiff argues

5   that the ALJ's finding that "Dr. Giroux De Armendariz's opinion was not supported by her

6   examination notes" is in error because (1) "the ALJ only refers to the positive finding that

7   Plaintiff exhibited 'tenderness' to suggest that the finding did not support Dr. Giroux De

8   Armendariz's limitations"; and (2) "the ALJ's boilerplate finding that Dr. Giroux De

9   Armendariz's opinion is not supported by her examinations is further unsupported by

10   substantial evidence where she fails to provide an adequate explanation in support of her

11   findings."  (*Id.* at 10-11.)  More specifically, Plaintiff identifies various reported symptoms

12   such as "left arm pain, night sweats, insomnia, dyspnea, abdominal pain, irregular

13   heartbeat/palpitations, swelling, joint instability, joint tenderness, limping, weakness,

14   anxiety, skin lesions, and vertigo" that the ALJ does not address.  (*Id.* at 12.)  As for the

15   consistency factor, Plaintiff again argues that the ALJ's rationale is "legally erroneous

16   where the ALJ fails to adequately explain her findings."  (*Id.* at 12-13.)  Plaintiff then

17   identifies a variety of symptoms that purportedly went unaddressed by the ALJ, including

18   "pain elicited by motion, pronation, and supination of the left forearm; pain, tenderness,

19   muscle spasm, abnormal motion, abnormal flexion, abnormal extension, and abnormal

20   spine rotation bilaterally of the lumbosacral spine upon palpation and/or motion; nontender

21   mass of right lateral thigh with erythema and drainage present; and mass present over left

22   lateral ankle that was tender to palpation."  (*Id.* at 13-14.)  Finally, Plaintiff argues that the

23   ALJ's cross-reference to the opinions of the state examiners "cannot constitute a valid

24   explanation of the consistency factor under the regulations."  (*Id.* at 14.)

25      The Commissioner disagrees and defends the sufficiency of the ALJ's rationale for

26   discrediting the opinions of Dr. Giroux.  (Dox. 13 at 6-12.)  As for the supportability factor,

27   the Commissioner argues that it is permissible to discount a medical opinion when the

28   opinion is unsupported by the provider's "examination findings and treatment notes."  (*Id.*

at 7-9.)  The Commissioner further argues that although the paragraph discussing Dr. Giroux's opinions only provided "one example of a discrepancy," the ALJ provided additional "discussions of Dr. Giroux De Armendariz's notes throughout the decision, showing that these notes contradicted her brief and unexplained answers in her check-box opinion," and emphasizes that "reviewing courts read an ALJ's decision as a whole and an ALJ is not required to restrict her analysis to a specific section of the decision." (*Id.* at 7-8.)  As for the consistency factor, the Commissioner contends there is substantial evidence to support the ALJ's finding of inconsistency because "the ALJ noted that much of the medical evidence indicated that Plaintiff was well-developed, well-nourished, doing well overall, and exhibited normal gait, posture, stance, muscle strength, musculoskeletal range of motion, coordination, motor functioning, grip strength, muscle bulk, deep tendon reflexes, sensation, heart function, peripheral perfusion, heart sounds, left ventricular systolic function, and bowel sounds" which is inconsistent with the "extreme intensity" of Dr. Giroux's limitations. (*Id.* at 10, citing AR at 408-413, 508, 514, 542, 560, 607, 673, 674, 677, 678, 705-713, 728, 746, 749, 757, 761, 770, 771, 787, 788, 856, 879.)  The Commissioner further argues that subsequent medical appointments (after the treatments by Dr. Giroux) demonstrate, among other things, "normal posture and gait, no deformity or scoliosis, and normal muscle strength." (*Id.* at 11-12.)  Finally, the Commissioner argues that "[e]ven if this Court finds Plaintiff's interpretation of these records to be rational, the ALJ's interpretation is also rational and must be upheld under the substantial evidence standard." (*Id.* at 12.)

In reply, Plaintiff argues that the ALJ's evaluation of Dr. Giroux's opinions remains erroneous because (1) the ALJ did not adequately explain "*how* she considered any of the above findings in reaching her conclusions," (2) the arguments made by the Commissioner are "*post-hoc* rationalization[s] that the Court is not permitted to accept," and (3) the ALJ did not provide "any explanation necessary to obtain a glimpse in her reasoning as to how the state agency consultants' opinions that Plaintiff could perform light work with additional limitations were nonetheless consistent with greater findings of the record noting

1    muscle spasms, antalgic gait, and spinal pain with motion as described above."  (Doc. 14
2    at 3-6.)

3         5.   Analysis

4         The ALJ's evaluation of Dr. Giroux's opinions is free of harmful error.  "The agency
5    must articulate how persuasive it finds all of the medical opinions from each doctor or other
6    source and explain how it considered the supportability and consistency factors in reaching
7    these findings."  *Woods*, 32 F.4th at 792 (cleaned up).  Here, the ALJ stated that although
8    "Dr. Giroux is a treatment provider, she provided minimal analysis in support of these
9    opinions, which she made on a check-box form," "these limitations are not supported by
10   her own examination findings of, for example, tenderness," and "the extreme intensity of
11   these limitations is unsupported by and inconsistent with the longitudinal record, as
12   described in the analysis of the Disability Determination Services consultant findings,
13   above."  (AR at 23.)  Thus, the ALJ expressly considered the supportability and consistency
14   factors.

15        The ALJ's determination as to each factor was also supported by substantial
16   evidence.  The ALJ addressed the supportability factor by stating that Dr. Giroux's opinion
17   "provided minimal analysis in support of these opinions, which she made on a check-box
18   form."  (AR at 24.)  To be sure, "there is no authority that a 'check-the-box' form is any
19   less reliable than any other type of form."  *Trevizo v. Berryhill*, 871 F.3d 664, 677 n.4 (9th
20   Cir. 2017).  Nevertheless, "[a]n ALJ is not required to take medical opinions at face value,
21   but may take into account the quality of the explanation when determining how much
22   weight to give a medical opinion.  While an opinion cannot be rejected merely for being
23   expressed as answers to a check-the-box questionnaire, the ALJ may permissibly reject
24   check-off reports that do not contain any explanation of the bases of their conclusions."
25   *Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020) (citations and internal quotation marks
26   omitted).

27        Plaintiff cites *Esparza v. Colvin*, 631 F. App'x 460 (9th Cir. 2015), and *Garrison v.
28   Colvin*, 759 F.3d 995 (9th Cir. 2014), for the proposition that the "mere fact that the opinion

1   was completed via check-box form and did not include explanations of Dr. Giroux De

2   Armendariz's limitations is not a valid basis by which the ALJ can reject the physician's

3   opinion." (Doc. 12 at 9-10.) But *Esparza* was decided under the old regulations. There,

4   the checkbox form was completed by a treating physician, which meant that the ALJ

5   needed to "set[] out a detailed and thorough summary of the facts and conflicting clinical

6   evidence, stating his interpretation thereof, and making findings." *Ezparza*, 631 F. App'x

7   at 462. Under the new regulations, ALJs are not required to make a heightened showing

8   before discrediting the opinions of a treating physician. And as noted, an ALJ may, under

9   appropriate circumstances, discount an unexplained checkbox form (such as the form here)

10  pursuant to the supportability factor. *See, e.g.*, *Weiss v. Kijakazi*, 2023 WL 4030839, *1

11  (9th Cir. 2023) ("These opinions were in check-box form and were not accompanied by

12  explanation or narrative. Because these opinions contained little in terms of 'objective

13  medical evidence and supporting explanations,' the ALJ reasonably found them

14  unpersuasive.").[3]

15      The ALJ's consideration of the supportability factor was also free of harmful error

16  for an additional reason. The ALJ separately concluded that the limitations to which Dr.

17  Giroux opined were "not supported by [Dr. Giroux's] own examination findings of, for

18  example, tenderness." (AR at 23.) In the underlying treatment note, Plaintiff was observed

19  as having "moderate" knee pain with "tenderness." (*Id.* at 508.) It was rational for the

20  ALJ to conclude that these observations were inconsistent with Dr. Giroux's extreme

21  opinion that Plaintiff would be unable to walk or stand for any period of time during a

22  workday. (*Id.* at 572.) Plaintiff argues the ALJ was required to provide a more complete

23  explanation, such as by addressing "how [Plaintiff's] bilateral knee tenderness and left

24  ankle tenderness accompanied with a nodule about the ankle does not support Dr. Giroux

25  De Armendariz's limitations, specifically those concerning Plaintiff's limitations with

26  walking and standing on a fulltime and sustained basis without excessive breaks or

27

28  _____
    [3]     This case is also distinguishable from *Colvin*, where the treating provider submitted
    "hundreds of pages of treatment notes," 759 F.3d at 1014 n. 17, given that Dr. Giroux only
    examined Plaintiff a handful of times (AR at 506, 518, 529).

absences." (Doc. 12 at 11.) But the Ninth Circuit's "cases do not require ALJs . . . to draft dissertations when denying benefits." *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020). Here, the ALJ adequately scrutinized Dr. Giroux's opinion under the supportability factor.

As for the consistency factor, the ALJ concluded that Dr. Giroux's opinions were "inconsistent with the longitudinal record, as described in the analysis of the Disability Determination Services consultant findings, above." (AR at 23.) On the preceding page of the opinion, the ALJ summarized the findings and opinions of several other examining medical sources, which demonstrated that Dr. Giroux's opined-to restrictions were the most severe of the bunch. (*Id.* at 22-23.) The ALJ also provided a detailed summary of evidence that could rationally be viewed as inconsistent with Dr. Giroux's restrictive conclusions. For example, on several occasions providers noted "that [Plaintiff's] gait, posture, stance, muscle strength, musculoskeletal range of motion, coordination, motor functioning, grip strength, muscle bulk, deep tendon reflexes, sensation, heart function, peripheral perfusion, heart sounds, left ventricular systolic function, and bowel sounds were normal, that she was well-developed and well-nourished, and that she was doing well overall." (*Id.* at 22, citing *id.* at 408-13, 508, 514, 542, 560, 607, 673-74, 677-78, 705-713, 728, 746, 749, 757, 761, 770-71, 787-88, 856, 879.) Indeed, some of the treatment notes cited by the ALJ, including some from examinations that occurred after Dr. Giroux's examination of Plaintiff, do not note any restrictions in ambulating. (*See, e.g.*, AR at 706 ["The claimant denies significant impact on activities of daily living. The claimant is able to complete self-care activities including meals, hygiene, and light housework. The claimant is not confined to bed, and gets adequate sleep."].) Under these circumstances, it was rational for the ALJ to conclude that the consistency factor undermined the persuasive value of Dr. Giroux's opinions. This is true even though, as Plaintiff correctly notes, there are some treatment notes in the record indicating that Plaintiff suffered from "left arm pain, night sweats, insomnia, dyspnea, abdominal pain, irregular heartbeat/palpitations, swelling, joint instability, joint tenderness, limping, weakness, anxiety, skin lesions, and

vertigo."  (Doc. 12 at 12, citing AR at 507, 514, 519, 520, 607, 697.)  Even so, it was rational for the ALJ to conclude that Plaintiff's normal gait and motor function were inconsistent with the severe limitations to which Dr. Giroux opined.  *Baca v. Comm'r of Soc. Sec. Admin.*, 2021 WL 1827232, *6 (D. Ariz. 2021) ("Although alternative views of this evidence are plausible, the ALJ's interpretation is a rational one and is therefore entitled to deference.") (citing *Thomas*, 278 F.3d at 954).  The Court will not reweigh the evidence when it is subject to two competing but reasonable interpretations.  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.") (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004)).

Plaintiff's final criticism is that it was error to allow the ALJ to cross-reference her analysis of the state agency medical consultants' opinions when evaluating Dr. Giroux's opinions because the "ALJ's summary of evidence provides no explanation as to how the isolated negative findings noted above do anything to contradict 'the intensity of her allegations' when evaluating the record as a whole."  (Doc. 12 at 14-15.)  The Court disagrees.  The ALJ was not required to methodically cite each item of evidence upon which she relied.  Rather, where an ALJ has summarized and interpreted the pertinent facts and conflicting evidence, the Court is permitted to draw reasonable inferences.  Here, the ALJ explicitly cross-referenced the analysis of the state agency medical consultants' opinions, which in turn cited several pages of medical records that contain objective medical findings that are inconsistent with Dr. Giroux's restrictions of what is essentially bedrest.  (AR at 22-23.)  Therefore, the ALJ adequately discussed the consistency of Dr. Giroux's opinions in relation to the other medical and opinion evidence in the record.

…

…

…

…

B.   **FNP-C Prusinski**

    1.   FNP-C Prusinski's Opinions

On February 3, 2021, FNP-C Prusinski wrote the following letter:

To whom it may concern,

Ms. Juanita Washington is a patient of Pueblo Family Physicians and she is requesting this note.  Ms. Washington does have known lumbosacral DDD, dextroscoliosis, thoracic spondylosis, DJD of bilateral knees.  Due to these ongoing issues, Ms. Washington does find it difficult to ambulate, walk up and down stairs, and to sit for excessive periods of time.  If more information is needed please contact Pueblo Family Physicians.

(AR at 765, 842, 847.)

    2.   The ALJ's Evaluation Of FNP-C Prusinski's Opinions

The ALJ found FNP-C Prusinski's opinions unpersuasive.  (*Id.* at 23.)  The ALJ's full rationale was as follows:

The undersigned considered the statements of treatment provider Philip Prusinski, FNP-C, who listed some of the claimant's impairments, and noted that the claimant finds it difficult to ambulate, walk up and down stairs, and to sit for excessive periods.  These statements are unpersuasive.  While Mr. Prusinski is a treatment provider, his wording indicates that the listed difficulties are a recitation of the claimant's subjective complaints, as opposed to Mr. Prusinski's opinions.  Regardless, while the undersigned has considered these statements as evidence, these statements are imprecise and vague in that they do not include specific functional limitations, thus rendering them impossible to compare with the longitudinal record, as described in the analysis of the Disability Determination Services consultant findings, above.

(*Id.*, record citations omitted.)

    3.   The Parties' Arguments

Plaintiff argues that "the ALJ does not adequately explain how the fact that F.N.P.-C. Prusinski specified that Plaintiff 'finds it difficult' to perform the activities for excessive periods of time necessarily translates to a recitation of Plaintiff's subjective report where the ALJ engages in no meaningful discussion as to whether the opinion was supported by objective findings gathered through the course of F.N.P.-C. Prusinski's examinations of Plaintiff."  (Doc. 12 at 16-17.)  Plaintiff further contends that "the ALJ's rejection of the opinion on the basis that his statements were imprecise and vague in that they did not

include specific functional limitations is legally erroneous where the ALJ failed to give an adequate explanation supported by relevant case law." (*Id.* at 17.)  Plaintiff argues that if the ALJ believed the opinion was vague, the ALJ had a duty to "develop and clarify the record." (*Id.* at 17-18.)  In the alternative, Plaintiff argues that the ALJ did not consider the "supportability and consistency factors" because the ALJ stated that it was "impossible for her to determine whether F.N.P.-C. Prusinski's opinion was consistent with the entirety of the evidence" and did "not explain how she considered the extent to which F.N.P.-C. Prusinski's opinion was consistent with Dr. Giroux De Armendariz and P.A.-C. Neal's opinion concerning limitations in prolonged sitting, standing, and/or walking." (*Id.* at 19-20.)

The Commissioner disagrees and defends the sufficiency of the ALJ's rationale for discrediting the opinions of FNP-C Prusinski.  (Doc 13 at 12-17.)  First, the Commissioner argues that the ALJ was not even required to consider FNP-C Prusinski's opinion because it "does not meet the definition of an opinion under the relevant regulations."  (*Id.* at 13.)  Alternatively, the Commissioner argues that the ALJ "properly evaluated Mr. Prusinski's opinion using the supportability and consistency criteria in the relevant regulations."  (*Id.*)  As for supportability, the Commissioner contends that "the ALJ reasonably found that Mr. Prusinski's opinion lacked support because the wording of the opinion indicated that 'the listed difficulties [were] a recitation of [Plaintiff's] subjective complaints, as opposed to Mr. Prusinski's opinions.'" (*Id.*)   As for consistency, the Commissioner argues that "[a]lthough Mr. Prusinski indicated that Plaintiff found it 'difficult to ambulate, walk up and down stairs, and sit for excessive periods of time,' he did not explain in what way finding it 'difficult' to perform such tasks limited her abilities or how long of a period he meant by 'excessive periods of time.'  Because these terms are undefined, it is impossible to determine whether Mr. Prusinski's opinion is consistent with the signs and symptoms recorded in the treatment and examination notes." (*Id.* at 14-15, internal citations omitted.) The Commissioner also summarizes FNP-C Prusinski's treatment notes and contends they are inconsistent with the assertions in the letter.  (*Id.* at 14.)  Finally, the Commissioner

1    argues that the ALJ had no duty to develop the record because such a duty arises only

2    "when 'there is ambiguous evidence or when the record is inadequate to allow for the

3    proper evaluation of the evidence.'"  (*Id.* at 15-17, quoting *Ford*, 950 F.3d at 1156.)

4        In reply, Plaintiff disputes the Commissioner's contention that "FNP-C Prusinski's

5    statement was not a medical opinion" given that he is an "acceptable medical source" and

6    indicated "impairment-related limitations or restrictions."  (Doc. 14 at 6.)  Plaintiff also

7    argues that the Commissioner's argument "should be rejected as a *post-hoc* rationale that

8    the ALJ herself did not provide."  (*Id.* at 7.)  As for supportability, Plaintiff reiterates that

9    the ALJ included "no discussion as to whether the opinion was supported by objective

10   evidence but rather finds in an entirely conclusory manner that the opinion relied on

11   subjective reporting" and argues that the Commissioner's discussion of FNP-C Prusinski's

12   treatment findings "again should be rejected as *post-hoc* rationalizations that Defendant

13   may not use to correct the ALJ's deficient consideration of the supportability factor." (*Id.*

14   at 7-8.)  Finally, as for consistency, Plaintiff argues that "FNP-C Prusinski's limitations

15   clearly set restrictions of Plaintiff's ability to perform physical activity necessary to

16   maintain fulltime employment.  The fact that the extent of these limitations was not

17   expressly defined does not give the ALJ a basis to reject them outright when the record is

18   consistent with FNP-C Prusinski's findings."  (*Id.* at 8-9.)

19              4.    Analysis

20       As an initial matter, Plaintiff is correct that because the ALJ did not reference FNP-

21   C Prusinski's treatment notes or suggest they failed to provide support for FNP-C

22   Prusinski's opinions, the Court cannot rely on them as a basis to affirm the ALJ's

23   supportability analysis.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th

24   Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's

25   decision based on the reasoning and factual findings offered by the ALJ—not *post hoc*

26   rationalizations that attempt to intuit what the adjudicator may have been thinking.").

27       It is a closer question whether FNP-C Prusinski's letter qualified as a "medical

28   opinion" and thus triggered the ALJ's duty to evaluate it as such.  A "medical opinion" is

defined by regulation as follows:

> A medical opinion a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . . (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting; (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).  Here, although FNP-C Prusinski's letter purported to describe certain functional imitations associated with Plaintiff's conditions, it did not (as discussed in more detail below) indicate that FNP-C Prusinski held any opinion with respect to those functional limitations.

Nevertheless, even assuming the ALJ was required to treat the letter as a medical opinion, the Court finds no harmful error in the ALJ's resulting evaluation.  The ALJ addressed the supportability factor by stating that the "wording" of FNP-C Prusinski's opinion "indicates that the listed difficulties are a recitation of the claimant's subjective complaints, as opposed to Mr. Prusinski's opinions."  (AR at 23.)  This conclusion is supported by substantial evidence.  In the letter, FNP-C Prusinski stated that "Ms. Washington does find it difficult" to ambulate, use the stairs, and sit.  (*Id.* at 842.)  This is not the same thing as saying that FNP-C Prusinski personally observed or determined that Plaintiff had such limitations.  It was thus reasonable for the ALJ to conclude that the letter merely reflected subjective complaints and not FNP-C Prusinski's assessment.

As for the consistency factor, the ALJ concluded that FNP-C Prusinski's "statements are imprecise and vague in that they do not include specific functional limitations, thus rendering them impossible to compare with the longitudinal record."  (AR at 23.)  Although expressed with less than ideal clarity, this was a permissible evaluation

of the consistency factor.  FNP-C Prusinski offered no analysis of what "excessive periods" should mean, nor did he indicate any specific limitations on walking or ambulating more generally.  (*Id.* at 765.)  The ALJ explicitly contrasted FNP-C Prusinski's opinions with the opinions of other medical sources whom the ALJ deemed more credible.  (*Id.* at 22-23.)  Those more-credible sources concluded, among other things, that Plaintiff could "work at the less than light exertion level with occasional lower extremity pushing and pulling operations, occasional postural activities other than no climbing of ladders, ropes, or scaffolds, and avoiding concentrated exposure to extreme cold, extreme heat, wetness, and humidity, and no exposure to hazards of heights and moving machinery."  (*Id.* at 22.)  The reasonable conclusion is that the ALJ found FNP-C Prusinski's opinions unpersuasive in part because of their inconsistency with these more-credible opinions.

Turning to Plaintiff's final argument, the Court acknowledges there is some tension between the claimant's burden to prove she is disabled and the ALJ's duty to develop the record.  *Cf. Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998) ("However, in so holding, we do not relieve Armstrong and other DIB claimants of their ultimate burden to prove disability before expiration of disability insured status.  Armstrong must still prove he was disabled while he was insured.  SSR 83–20 only requires that the ALJ assist the claimant in creating a complete record.").  In any event, here the ALJ did not have a duty to develop the record.  "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  The record in this case is replete with medical evidence, including eight medical opinions that the ALJ evaluated.  There is no ambiguity or inadequacy in the record that would suggest the ALJ lacked the ability to make an informed decision.  *Mayes*, 276 F.3d at 460 ("The record before the ALJ was neither ambiguous nor inadequate to allow for proper evaluation of the evidence.  Substantial evidence supported the ALJ's decision that Mayes was not disabled.").

…

C.   **Plaintiff's Symptom Testimony**

    1.   <u>Standard Of Review</u>

An ALJ must evaluate whether the claimant has presented objective medical evidence of an impairment that "could reasonably be expected to produce the pain or symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (citations omitted). If so, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). Instead, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015). In this analysis, the ALJ may look to "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citing *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)).

    2.   <u>The ALJ's Evaluation Of Plaintiff's Symptom Testimony</u>

The ALJ provided the following evaluation of Plaintiff's symptom testimony:

> The claimant alleged, for example, that she has a difficult time walking, standing, sitting, or moving around due to her pain. She testified that even walking 15 steps to the mailbox is painful. She noted that her arm still bothers in the wake of being broken. She testified that her right knee has been giving out on her for over a year as of the hearing. She reported that she cannot lift anything over five pounds, and cannot sit or stand more than 10-15 minutes at a time. She testified that she is up all night due to her pain, and that her daughter helps her with everything. She reported eye blurriness when looking at a computer screen for more than 20 minutes. She testified that she has fallen, and that she has a cane for when she goes out of the house, which she uses to help with walking, though that it was not prescribed. She also testified that when she is sitting down, she props her feet up due to her swelling and impairments.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms

are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Medical record review

In line with the claimant's allegations, she was assessed with mild degenerative changes of the bilateral knees including osteoarthritis and with swelling at times, and spinal imaging showed mild multilevel degenerative disc disease including spondylosis and dextroscoliosis.  These objective findings are consistent with some limitations.  Consistent with the diagnostic findings and the residual functional capacity assessed in this decision, the claimant's objective clinical examinations have also failed to corroborate the full extent of the alleged severity, limiting effects, and frequency of her condition.  While the claimant has some positive findings, they are generally limited to tenderness on palpation, spinal muscle spasms, spinal pain with range of motion, spinal tenderness, knee tenderness, and knee pain with range of motion.   Indeed, her gait, posture, stance, muscle strength, musculoskeletal range of motion, coordination, motor functioning, grip strength, muscle bulk, deep tendon reflexes, and sensation were observed to be normal.  At her June of 2020 consultative examination, she was noted as not using an assistive device, and was able to stand, walk to the examination table, get onto, and sit on the examination table without assistance or difficulty.  Additionally, her vision was assessed in December of 2020 as 20/30 in the right eye and 20/25 in the left eye without glasses.  While the undersigned noted that at the consultative examination, her gait observed to be "mildly antalgic", her lower extremity strength was minimally reduced to 4/5, and she had difficulty walking on her heels and toes and in tandem walking, with some unsteadiness noted, this was not observed at provider examinations.  She was positive for spinal muscle spasms, spinal pain with range of motion, spinal tenderness, knee tenderness, and knee pain with range of motion.  Further exacerbating her exertional limitations, she was diagnosed with morbid obesity, with a body mass index exceeding 45, as well as type II diabetes mellitus.

Furthermore, her cardiovascular rate, cardiovascular rhythm, peripheral perfusion, heart sounds, heart function, respiratory functioning, and bowel sounds were observed to be normal, and echocardiogram testing indicated normal left ventricular systolic function.  Additionally, her lungs were clear to auscultation, her respirations were non-labored, and she was described as well-developed and well-nourished.  Finally, she was at times described as doing well overall.

The claimant's treatment history further illustrates the non-debilitating nature of her medical condition, as she reportedly improved with physical therapy noting she was "at the point where she would be able to complete all tasks with minimal difficulty". As well, there is information in the record that draws into question the claimant's alleged reliance on an assistive device.  While she testified she used a cane, the record fails to support the same.  Indeed, she was able to exercise for 4:10 minutes and achieved 6.02 METS.  Her diabetes appears to be well controlled on medications.  The undersigned has also considered the claimant's obesity noting the claimant reported seeing a nutritionist currently.   The undersigned considered the potential impacts of the claimant's obesity in causing or contributing to her co-existing impairments in accordance with SSR 19-2p.   However, there is scant evidence of any specific or quantifiable impact on her cardiac, pulmonary, musculoskeletal, endocrine, or mental functioning due to obesity alone.

1
2
3
4
5
6

> In sum, while the claimant was assessed with bilateral knee osteoarthritis, degenerative disc disease, diabetes, and morbid obesity, it was on other occasions noted - in contradiction to the intensity of her allegations - that her gait, posture, stance, muscle strength, musculoskeletal range of motion, coordination, motor functioning, grip strength, muscle bulk, deep tendon reflexes, sensation, heart function, peripheral perfusion, heart sounds, left ventricular systolic function, and bowel sounds were normal, that she was well-developed and well-nourished, and that she was doing well overall. Further, the record fails to support her allegations that she needed to elevate her legs to the extent alleged.

7  (AR at 19-21, record citations omitted.)

8          3.          The Parties' Arguments

9          Plaintiff argues that the ALJ "does not provide any meaningful discussion to support
10  her conclusion that Plaintiff's statements were not consistent with the entirety of the
11  evidence, but rather immediately summarizes the medical evidence of the record in
12  determining that her examinations contradicted the intensity of her allegations." (Doc. 12
13  at 21-23.)   Plaintiff also argues the ALJ's analysis was deficient "where the ALJ
14  impermissibly picks and chooses from the evidence she contends supports her conclusion
15  while ignoring all other evidence that conflicts with her findings." (*Id.* at 23.) Plaintiff
16  further contends that the ALJ's rationale for discrediting her symptom testimony was
17  flawed because the ALJ only considered "whether the objective evidence supports
18  Plaintiff's allegations" and not "Plaintiff's symptoms and activities of daily living." (*Id.*
19  at 24-25, citing AR at 315, 617.)  Finally, Plaintiff challenges the ALJ's finding about
20  Plaintiff's need to elevate her legs as "legally erroneous where the ALJ provides no
21  explanation to support her findings." (*Id.* at 25.)

22          The Commissioner defends the sufficiency of the ALJ's reasoning, arguing that the
23  ALJ properly discredited Plaintiff's symptom testimony based on (1) the ALJ's review of
24  the objective medical evidence; (2) evidence that Plaintiff had lied about needing to use a
25  cane; (3) the fact that Plaintiff's impairments responded well to prescribed treatment and
26  appeared to be controlled well by medication; and (4) the fact that "the majority of the
27  medical opinions and prior administrative medical findings in the record contradicted the
28  alleged extent of Plaintiff's limitations." (Doc. 13 at 17-25.)

1
2
3
4
5
6
7
8

       In reply, Plaintiff first challenges the Commissioner's contention that objective medical evidence can support discrediting her testimony. (Doc. 14 at 10.) Next, Plaintiff reiterates that the "ALJ is required to consider the extent to which Plaintiff's allegations were consistent with her activities of daily living despite her symptoms, including that Plaintiff reported throughout the record that her pain worsened with walking, lifting, going up and down stairs, and sitting for long periods of time." (*Id.* at 10-11.) Finally, Plaintiff argues that the cane-related discussion in the Commissioner's brief is a "*post-hoc* rationalization that the ALJ did not find." (*Id.*)

9

                        4.   <u>Analysis</u>

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

       The Court finds no harmful error in the ALJ's evaluation of Plaintiff's symptom testimony. One of the ALJ's proffered reasons for discounting Plaintiff's testimony was that it was inconsistent with the objective medical evidence in the record. Although this may not serve as an ALJ's sole reason for discounting a claimant's symptom testimony, it is a permissible consideration when (as here) it is coupled with other grounds for an adverse credibility finding. *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("Claimants like Smartt sometimes mischaracterize [Ninth Circuit law] as completely forbidding an ALJ from using inconsistent objective medical evidence in the record to discount subjective symptom testimony. That is a misreading of [Ninth Circuit law]. When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony. We have upheld ALJ decisions that do just that in many cases."); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.").

25
26
27
28

       The ALJ's finding of inconsistency with the objective medical evidence was supported by substantial evidence. To provide one example, the ALJ noted that although Plaintiff "reported eye blurriness when looking at a computer screen for more than 20 minutes," Plaintiff's "vision was assessed in December of 2020 as 20/30 in the right eye

1   and 20/25 in the left eye without glasses." (AR at 20.)  Both of these assertions are, as a

2   factual matter, supported by substantial evidence. (*Id.* at 314 [Plaintiff's December 2019

3   function report: "eyes get blurred when looking at a computer screen for more than 20

4   minutes"]; *id.* at 508 [December 2019 medical note, indicating "normal" eyes]; *id.* at 607

5   [December 2019 medical note, indicating same]; *id.* at 707 [June 2020 medical note,

6   indicating same]; *id.* at 856 [December 2020 medical note: "The patient was presented to

7   the clinic with 20/30 vision in the right eye and 20/25 in the left without glasses.  Intraocular

8   pressure was normal in both eyes.  Anterior segment findings were normal in both eyes.

9   Dilated internal examination showed normal optic nerve health and retinal findings with

10  no diabetic retinopathy."].)  It was rational for the ALJ to view this objective medical

11  evidence as inconsistent with Plaintiff's testimony.

12          As another example, the ALJ noted that although Plaintiff "testified that even

13  walking 15 steps to the mailbox is painful," that "she cannot lift anything over five

14  pounds," and that she "cannot sit or stand more than 10-15 minutes at a time," the objective

15  medical evidence showed that, "[w]hile the claimant has some positive findings, they are

16  generally limited to tenderness on palpation, spinal muscle spasms, spinal pain with range

17  of motion, spinal tenderness, knee tenderness, and knee pain with range of motion.  Indeed,

18  her gait, posture, stance, muscle strength, musculoskeletal range of motion, coordination,

19  motor functioning, grip strength, muscle bulk, deep tendon reflexes, and sensation were

20  observed to be normal." (*Id.* at 20.)  The ALJ's assertions on these points are, as a factual

21  matter, supported by substantial evidence. (*Id.* at 43 [Plaintiff's hearing testimony: "even

22  . . . walking 15 steps to the mailbox is painful"]; *id.* 320 [Plaintiff's function report,

23  identifying "lift over 5 lbs" and "stand longer than 10 to 15 minutes at a time" as things

24  "you can't do now"]; *id.* at 514 [November 2019 medical note: "Musculoskeletal: Normal.

25  Visual overview of all four extremities is normal."]; *id.* at 607 [December 2019 medical

26  note: "Musculoskeletal: Normal ROM, no tenderness, no swelling, no deformity, No signs

27  of compartment syndrome."]; *id*. at 673-74 [January 2020 medical note: "General/bilateral:

28  Musculoskeletal system: normal."].)  It was rational for the ALJ to view this objective

- 22 -

1    medical evidence as inconsistent with Plaintiff's testimony.

2        Another of the ALJ's reasons for discrediting Plaintiff's symptom testimony was

3    that she had made false claims about cane usage.  (*Id.* at 21 ["[T]here is information in the

4    record that draws into question the claimant's alleged reliance on an assistive device.

5    While she testified she used a cane, the record fails to support the same."].)  This, too,

6    qualifies as a specific, clear and convincing reason under Ninth Circuit law for discrediting

7    a claimant's symptom testimony.  *See, e.g., Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th

8    Cir. 1999) (concluding that "the ALJ did offer clear and convincing reasons for rejecting

9    Verduzco's testimony" where "the ALJ noted that the appellant had walked slowly and

10   used a cane at the hearing, although none of his doctors had ever indicated that he used or

11   needed to use an assistive device in order to walk" and "two doctors had specifically noted

12   that the appellant did not need such a device"); *Donathan v. Astrue*, 264 F. App'x 556, 558

13   (9th Cir. 2008) (concluding that "the ALJ provided clear and convincing reasons for

14   rejecting Donathan's subjective allegations" where the ALJ "offered several reasons

15   supporting the adverse credibility determination, including . . . inconsistencies regarding

16   Donathan's need for use of a cane or scooter"); *Doyle v. Comm'r of Soc. Sec. Admin.*, 2022

17   WL 4354608, *6 (D. Ariz. 2022).

18       The ALJ's conclusions on this point were supported by substantial evidence.

19   During the hearing, Plaintiff testified: "I do have a cane. . . .  The doctor did not prescribe

20   it, so I had to get one on my own. . . .  I use it to help in assisting me with walking, if I need

21   to walk to the car or if I go to the store with my daughter and to—you know, things of that

22   nature." (AR at 44-45.)  Similarly, in her function report, Plaintiff checked a box indicating

23   that she used a cane and wrote: "I have a cane that a friend gave me."  (*Id.* at 319.)

24   However, on July 24, 2019—about a week before the alleged onset date—Plaintiff did not

25   use a cane when completing a 4 minute, 10 second stress test on a treadmill.  (*Id.*at 492.)

26   Similarly, in a June 2022 medical record, a consultative examiner wrote that Plaintiff "does

27   not use any assistive device" and could "stand, walk to the examination table, [and] get

28   onto and sit on the examination table without assistance and without difficulty."  (*Id.* at

707.)  The ALJ's decision also contains citations to many other medical records from the period of alleged disability in which Plaintiff was observed exhibiting a "normal" gait. (*See, e.g., id.* at 749 [February 2020: "normal posture and gait"].)  Although not all of these medical records are cited in the specific portion of the ALJ's decision discussing the cane-usage issue, a reviewing court considers the agency's decision as a whole, "[l]ooking at *all* the pages of the ALJ's decision," when determining whether substantial evidence supports the decision.  *Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022).  On this record, it was rational for the ALJ to conclude that Plaintiff had made inaccurate or exaggerated statements regarding her cane usage and to discount her credibility on that basis.  *See also Tommasetti*, 533 F.3d at 1039 ("The ALJ may consider . . . ordinary techniques of credibility evaluation, such as  . . . other testimony by the claimant that appears less than candid . . . .") (citation omitted); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (identifying a "tendency to exaggerate" as a "specific and convincing reason[] . . . for discrediting [a claimant's] testimony").

Because the ALJ identified multiple clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's symptom testimony, it is unnecessary to resolve Plaintiff's objections to the additional rationales the ALJ offered for discrediting her testimony.  Any error as to those additional rationales was harmless.  *See, e.g., Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) ("[S]everal of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."); *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . .  [T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error. . . .  Here, the ALJ's decision finding Carmickle less than fully credible is valid, despite the errors identified above.").

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **affirmed**.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 20th day of September, 2023.

Dominic W. Lanza
United States District Judge